UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MICHAEL LEVITIS,

                              Petitioner,                    **<u>ORDER</u>**

        - against -                                         15 Civ. 8977 (PGG)

UNITED STATES OF AMERICA,

                              Respondent.


PAUL G. GARDEPHE, U.S.D.J.:

   On April 8, 2014, Petitioner Michael Levitis pleaded guilty to conspiracy to

commit mail and wire fraud, and conspiracy to commit wire fraud, in violation of 18 U.S.C. §

371.  (<u>See</u> No. 13 Cr. 327, Plea Tr. (Dkt. No. 102))  On November 19, 2014, this Court sentenced

Levitis to 108 months' imprisonment.  (<u>See</u> No. 13 Cr. 327, Judgment (Dkt. No. 146))

   Levitis now petitions this Court, pursuant to 28 U.S.C. § 2255, to vacate, set

aside, or correct his sentence.  (<u>See</u> No. 15 Civ. 8977, Pet. (Dkt. No. 1))  Levitis argues that the

waiver provision in his plea agreement – in which he agreed not to appeal or collaterally

challenge a sentence within the stipulated Guidelines range of 87 to 108 months' imprisonment –

is unenforceable.  (<u>Id.</u>)  Levitis further contends that his lawyer was constitutionally ineffective

in (1) advising Levitis to plead guilty and enter into the plea agreement; (2) failing to object to

purported deficiencies in the wire fraud conspiracy count; (3) failing to dispute a three-level role

in the offense enhancement imposed pursuant to U.S.S.G. § 3B1.1(b); and (iv) failing to object to

certain alleged factual errors in the Presentence Investigation Report.  (<u>Id.</u>)  For the reasons

stated below, Levitis's petition will be denied in its entirety.

## BACKGROUND

### I.  FACTS AND PROCEDURAL HISTORY

#### A.  Indictment

Indictment No. 13 Cr. 327 (PGG) charges Defendant Michael Levitis; his company, Mission Settlement Agency ("Mission"), also known as Alpha Debt Settlement ("Alpha"); and three Mission employees – Denis Kurlyand, Boris Shulman, and Manuel Cruz – with conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349; mail fraud, in violation of 18 U.S.C. § 1341; and wire fraud, in violation of 18 U.S.C. § 1343.  (No. 13 Cr. 327, Indictment (Dkt. No. 1))  The Indictment alleges that Mission – a debt settlement services company – "systematically exploited and defrauded over a thousand financially disadvantaged individuals across the country" by "falsely and fraudulently trick[ing] . . . such individuals into becoming Mission's customers."  (Id. ¶ 6 (capitalizations altered))

Levitis "operated and controlled" Mission and "was responsible for managing [its] day-to-day operations, its finances, its hiring and termination of employees, and its advertising and solicitation of customers."  (Id. ¶ 2)  Co-defendant Kurlyand was Mission's Vice President of Sales; Shulman was a Mission sales representative; and Cruz was an office assistant at Mission.  (Id. ¶¶ 3-5)

According to the Indictment, Defendants induced Mission's clients to sign contracts for Mission's services based on numerous misrepresentations, including that Mission would charge them a monthly fee of only $49.  In reality, Mission charged an up-front fee equal to 18 percent of the debt a client owed.  (Id. ¶¶ 11-12)  Mission deducted that amount from monies that Mission clients paid to a third-party processor, believing that the funds would be held in escrow and ultimately delivered to creditors.  (Id.)  Defendants also falsely represented to

Mission clients that Mission was affiliated with the federal government and with a major credit bureau.  (Id. ¶¶ 7, 14-15)  At least 2,200 Mission clients paid nearly $14 million to Mission. Mission "took for itself over $6.6 million in fees and paid only approximately $4.4 million to customers' creditors."  (Id. ¶ 8)  As to more than 1,200 of those customers, Mission "took fees totaling nearly $2.2 million and . . . never paid a single penny to the customers' creditors as payment for any negotiated debt."  (Id.)  Because of the fraudulent actions of Levitis and his co-defendants, Mission's clients suffered, inter alia, lawsuits from their creditors, damage to their credit ratings, and bankruptcy.  (Id.)

The Indictment was precipitated by the cooperation of two former Mission employees:  Felix Lemberskiy and Zhakhir Shirinov.  Each man pled guilty to an information charging the same offenses and conduct as the Indictment.  (No. 13 Cr. 327, Govt. Sentencing Br. (Dkt. No. 134) at 10)[1]  Their cases proceeded before other judges in this District.  (See No. 13 Cr. 325 (RA), Information (Dkt. No. 2); No. 13 Cr. 325 (RA), Plea Tr. (Dkt. No. 30); No. 13 Cr. 319 (DLC), Information (Dkt. No. 3); No. 13 Cr. 319 (DLC), Plea Tr. (Dkt. No. 10))

   **B.**   **Guilty Plea**

On April 8, 2014, Levitis entered into a plea agreement with the Government (the "Plea Agreement"), pursuant to which he agreed to plead guilty to the charges in a two-count superseding information (the "S1 Information").  (S1 Information (Dkt. No. 86))  That same day, Levitis pleaded guilty before this Court to conspiracy to commit mail and wire fraud, and conspiracy to commit wire fraud, in violation of 18 U.S.C. 371.  (No. 13 Cr. 327, Plea Tr. (Dkt.

---

[1]  Citations to page numbers of docketed materials refer to the pagination generated by this District's Electronic Case Files ("ECF") system.

No. 102); Plea Amgt. at 1)  By the time of Levitis's guilty plea, two of his co-defendants –
Kurlyand and Shulman – had already pled guilty.[2]

### 1.   The (S1) Information

The (S1) Information charges Levitis with conspiracy to commit mail and wire
fraud, and conspiracy to commit wire fraud, both in violation of 18 U.S.C. § 371.  (See No. 13
Cr. 327, (S1) Information (Dkt. No. 86))  The factual allegations underlying the first count are
substantively identical to those underlying the Indictment's conspiracy count.  (See id. ¶¶ 1-4).
As to the second count – which charges wire fraud conspiracy – the Government alleged that
Levitis had "engaged in a scheme to defraud customers of Alpha Debt Settlement ('Alpha') by,
among other things, making misrepresentations about Alpha's fees, results, and affiliations."  (Id.
¶ 5)  The Government alleged that, in furtherance of this scheme, Levitis "[o]n or about May 11,
2012, . . . sent an e-mail to employees of Alpha instructing them to make certain
misrepresentations to prospective customers on behalf of Alpha."  (Id. ¶ 7)

In pleading guilty to the (S1) Information, Levitis drastically reduced his
sentencing exposure.  If Levitis had been found guilty of the three charges in the Indictment, he
would have faced a maximum sentence of 60 years' imprisonment.  See 18 U.S.C. § 1349 ("Any
person who . . . conspires to commit [mail or wire fraud] under this chapter shall be subject to the
same penalties as those prescribed for the offense, the commission of which was the object of the
. . . conspiracy."); 18 U.S.C. § 1341 (stating that whoever commits mail fraud "shall be . . .

---

[2]  On August 15, 2013, Kuryland pled guilty to all three counts in the Indictment.  (See No. 13
Cr. 327, Kurlyand Plea Tr. (Dkt. No. 50))  On February 14, 2014, Shulman did the same.  (See
No. 13 Cr. 327, Shulman Plea Tr. (Dkt. No. 77))  Cruz pled guilty on April 22, 2014, shortly
after Levitis's guilty plea.  Cruz pled guilty to conspiracy to commit mail and wire fraud, in
violation of 18 U.S.C. § 371.  (See No. 13 Cr. 327, Cruz Plea Tr. (Dkt. No. 98); S2 Information
(Dkt. No. 93))

imprisoned not more than 20 years"); 18 U.S.C. § 1343 (setting the same penalty for wire fraud). Because the conspiracy counts in the (S1) Information are predicated on 18 U.S.C. § 371 rather than 18 U.S.C. § 1349, and because the (S1) Information charges no substantive fraud counts, Levitis faced a maximum sentence of only ten years' imprisonment.  See 18 U.S.C. § 371 (providing that violators of the statute "shall be . . . imprisoned not more than five years").

      2.     **Plea Agreement**

In the Plea Agreement, Levitis agreed to plead guilty to the (S1) Information. (Plea Agmt. at 1)  Levitis and the Government also entered into the following Sentencing Guidelines stipulations:  (1) the base level was 6, pursuant to U.S.S.G. § 2B1.1(a)(2); (2) a 16-level enhancement under U.S.S.G. § 2B1.1(b)(1)(I) applied, because the loss amount was between $1 million and $2.5 million; (3) a 6-level enhancement under U.S.S.G. § 2B1.1(b)(2)(C) applied, because the offense involved 250 or more victims; (4) a 3-level enhancement under U.S.S.G. § 3B1.1(b) applied given Levitis's role as "a manager or supervisor (but not an organizer or leader)" of "criminal activity [that] involved five or more participants or was otherwise extensive"; and (5) a 3-level reduction under U.S.S.G. § 3E1.1(a) and (b) applied for acceptance of responsibility.  (Plea Agmt. at 3)  Based on these calculations, the parties agreed that Levitis's total offense level was 28.  (Id.)

As to Criminal History Category, Levitis and the Government agreed that he had 3 criminal history points (1 point from a prior conviction that resulted in no prison time, and 2 points because the instant offense occurred while he was on probation for the prior conviction). (Id. at 3-4)  Accordingly, Levitis fell within Criminal History Category II.  (Id. at 4)  The parties further agreed that, at Offense Level 28 and Criminal History Category II, Levitis's Sentencing Guidelines range was 87 to 108 months' imprisonment.  (Id.)

In the Plea Agreement, Levitis agreed that – should the Court sentence him to a term of imprisonment "within or below the Stipulated Guidelines Range of 87 to 108 months' imprisonment" – he would not "file a direct appeal; nor bring a collateral challenge, including but not limited to an application under Title 28, United States Code, Section 2255." (Id. at 5)

### 3.    Rule 11 Proceeding

On April 8, 2014, Levitis pleaded guilty before this Court to the (S1) Information. At the time, Levitis was a 37-year-old lawyer, and this was not his first guilty plea to a federal felony.[3] (No. 13 Cr. 327, Plea Tr. (Dkt. No. 102) at 8)  Levitis told the Court that he was "pleading guilty because [he was] in fact guilty," and that he was pleading guilty "voluntarily and of [his] own free will." (Id. at 28)

Levitis informed the Court that he had "discussed with [his lawyer] the charges against [him], including [his] intention to plead guilty," and had "discussed with [his lawyer] any possible defenses [he] might have to the[] charges as well as all the facts about [his] involvement in these matters." (Id. at 10)  Levitis also confirmed that his lawyer had told him about the consequences of pleading guilty. (Id. at 10-11)  And Levitis further confirmed that he was satisfied with his lawyer's representation of him. (Id. at 11)

---

[3] Levitis's practice included matters in the Eastern District of New York, where he represented clients primarily in personal injury cases. See, e.g., Beylis v. Latham, No. 1:04-cv-03325-CBA-CLP; Cheberko v. Krotov, No. 1:04-cv-0899-CBA-KAM; Zheleznyak v. Nyamadi-Annang, No. 1:03-cv-1403-ARR-ASC; Edris, et al. v. ELRAC, Inc. et al., No. 1:01-cv-5951-CBA-RML; Carter v. Braxton, et al., No. 1:00-cv-2633-ERK-SMG.  His license was suspended in January 2012, after his felony conviction for making a false statement to a federal law enforcement officer in connection with an investigation of a New York State senator for corruption.  For that violation of 18 U.S.C. §1001, Levitis was sentenced to three years' probation and a $15,000 fine. (See In re: Michael Levitis, Esq., No. 12-mc-174 (BMC) (E.D.N.Y) (Dkt. Nos. 1, 3); United States v. Levitis, No. 11 Cr. 113 (ARR) (E.D.N.Y.) (Dks. No. 1, 28, 32))

This Court informed Levitis that each count to which he intended to plead guilty carried a maximum term of five years' imprisonment, which could be imposed concurrently or consecutively.  (See id. at 18-19)  Levitis told the Court that he understood this, and that he understood that "even if [his] sentence is different from what [his] attorneys or anyone else told [him] it might be, or if it is different from what [he] expect[s], [he] will still be bound by [his] guilty plea. . . ."  (Id. at 22)

As to the plea agreement, Levitis told the Court that he had read the agreement before signing it, discussed the agreement with his lawyer, and fully understood all of its terms before signing it.  (Id.)  He also told the Court that no one had "offered [him] any inducements or threatened [him] or forced [him] to plead guilty or to enter into" the Plea Agreement.  (Id. at 24)  When the Court told Levitis that "[o]ne of the terms of the plea agreement is that so long as [the Court] sentence[s] [Levitis] to 108 months of imprisonment or less, [he] may not appeal [his] sentence or file any collateral challenge attacking the legality of [his] sentence," Levitis stated that he understood this provision.  (Id. at 24-25)

Levitis then gave the following factual allocution:

> Judge, from 2009 through April 2013, I along with others operated Mission Settlement Agency, a debt . . . settlement company.  During this period, I agreed with other employees of the company to defraud Mission Settlement Agency's customers by making misrepresentations about Mission's fees and results, among other things.  Those misrepresentations were made for the purpose of obtaining money and property.  As part of this conspiracy and to further the scheme to defraud, I and others knowingly mailed materials using the Postal Service and private carriers.  For example, in or about 2011[,] I knowingly caused a solicitation letter to be mailed that contained fraudulent and deceptive information.  In addition, as part of the conspiracy and to further the scheme to defraud, I and others transmitted various writings, pictures, and sounds by means of wire, radio, and television in interstate and foreign commerce. . . .
> Also, your Honor, from about 2011 through 2013, I along with others operated Alpha Debt Settlement, also a debt settlement company.  During this period I agreed with other employees of the company to defraud Alpha Debt Settlement customers by making misrepresentations about Alpha's fees and results, among

other things.  Those misrepresentations were made for the purpose of obtaining money and property.  As part of this conspiracy and to further the scheme to defraud, I and others knowingly mailed materials using U.S. Postal Service and private carriers.  For example, on May 11, 2012, I knowingly sent an e-mail to certain Alpha employees in which I instructed the employees to make misrepresentations to Alpha customers. . . .

Also, your Honor, if I might just add that I am here to accept responsibility for my actions.  I took advantage of people who were struggling financially and caused them financial loss and hardship. . . .

(Id. at 26-27)

C.    **Sentencing**

1.    **Presentence Investigation Report**

The U.S. Probation Office issued a Presentence Investigation Report ("PSR") on October 9, 2014.

As to offense conduct, the PSR's account is largely consistent with the Indictment's assertions.  The PSR states, for example, that Levitis "operated and controlled Mission," and "was responsible for managing Mission's day-to-day operations, its finances, its hiring and termination of employees, and its advertising and solicitation of customers."  (PSR ¶ 11)  Levitis and his co-defendants "[p]rey[ed] upon the financial desperation of individuals struggling to pay off their credit card debts," and "falsely tricked over 1,000 such individuals into becoming Mission's customers with significant, but false, assurances about Mission's ability to help as well as about the fees Mission would charge in exchange for that help."  (Id. ¶ 15)  The Defendants "commonly lied about and/or concealed Mission's fees, falsely indicating Mission would charge a mere $49 per month when, in fact, Mission took thousands of dollars in fees from funds that its customers had set aside because they believed the funds would be used to pay creditors."  (Id. ¶ 16)

The Defendants "promised prospective customers that Mission would negotiate a substantial reduction in debt for them, typically promising . . . that they would have to pay only 55% of the amount owed to creditors."  (Id. ¶ 22).  In reality, "for the majority of customers, Mission actually did little or no work and failed to achieve any reduction in debt whatsoever." (Id. ¶ 16; see id. ¶ 22 ("Mission did little or no meaningful work to negotiate reductions in debt for many of its customers."))

"[B]etween mid-2009 and March 2013, approximately 2,200 customers paid a total of nearly $14 million in connection with Mission's purported debt settlement services. . . . For over 1,200 of its customers, Mission took fees totaling nearly $2.2 million and never paid a single penny to the customers' creditors as payment for any negotiated debt."  (Id. ¶ 17)

As to Sentencing Guidelines offense level and criminal history category, the PSR reports the same base offense level, enhancements, and criminal history calculations as those to which Levitis and the Government had stipulated in the Plea Agreement.  (Id. ¶¶ 32-42) Accordingly – consistent with the Plea Agreement – the PSR reports that Levitis's Sentencing Guidelines range is 87 to 108 months' imprisonment.  (Id. ¶ 109)  The Probation Office recommended a 108-month term of imprisonment, given the harm Levitis had caused and his role in the offense.  (Id. at 28-31)

> 2.      **Sentencing Submissions**

> a.      **Levitis's Initial Sentencing Brief**

In his October 14, 2014 sentencing brief, Levitis's lawyer – Charles Ross – asked the Court to impose a below-Guidelines sentence of 60 months' imprisonment.  (See No. 13 Cr. 327, Def. Sentencing Br. (Dkt. No. 125) at 30)  Ross did not object to any of the PSR's Guidelines calculations which, as noted above, are identical to those set forth in the Plea

Agreement.  Ross also did not object to the factual portions of the PSR.  Indeed, Ross acknowledged that Levitis and Mission had engaged in the criminal conduct to which Levitis had pleaded guilty.  (See id. at 5 ("Mr. Levitis and his employees . . . engage[d] in deceptive practices, which included lying to customers about the fees they would be charged, the company's success rate, and the company's affiliations, in order to increase the number of Mission's customers."; id. at 5-6 ("Mission did little to no meaningful work for a significant number of Mission's customers.  The victims' losses . . . are the fees they paid to the company – an average of $1,800 per victim."))

Ross emphasized, however, that when Levitis began operations at Mission, he had not intended to commit fraud.  According to Ross, when Levitis started Mission, he "intended for Mission to be a legitimate business whose practices followed a standard industry model.  He had no intention of engaging in fraud."  (Id. at 5; see also id. at 21 ("Mr. Levitis did not begin Mission . . . with the intent of committing fraud.  Instead, he anticipated that Mission would be a legitimate and profitable business.  Mission was based on a standard industry model . . . which was in compliance with the consumer protection laws at the time of its implementation."))

Although Levitis went on to engage in unlawful conduct, "allow[ing] – and in some cases encourag[ing] – his staff to make misrepresentations," Levitis "did take some measures to try to rectify the grosser abuses at Mission."  (Id. at 23)  For example, in May 2012 – a year before his arrest – Levitis "retained outside counsel to provide advice on marketing materials and company practices, and on the advice of outside counsel," and "he implemented the practice of recording disclosures to customers about the fees and the risks of debt settlement programs."  (Id. at 21)  Ross argued that this behavior "demonstrate[d] that Mr. Levitis was conflicted about his criminal conduct."  (Id. at 24)

Ross's brief also emphasized that – although Mission "failed to perform meaningful work for more than 1200 customers" (id. at 23) – it had provided useful services to some of its clients.  (Id. at 22 ("From late 2009 to mid-2013, . . . Mission had approximately 2600 participating customers.  Following the industry model, Mission successfully negotiated at least some of the accounts for a significant number of customers, saving them a substantial amount of money in debt owed.  Some of Mission's customers saw their debts eliminated entirely."))

Levitis also submitted a letter to the Court.  In pertinent part, the letter states:

> I write this to you with full knowledge that I am indeed guilty and that I deserve to be punished for what I have done and for what was done under my watch.  Not only do I fully realize that I am guilty in the legal sense but I have also done morally wrong things and have hurt many people in the process. . . . I am filled with remorse that my intentional and fraudulent conduct ruined so many people's lives.  I am alone to blame for their losses and pain. . . .  I surrounded myself with people who followed me and took my counsel . . . I groomed my employees to follow me . . . [and] chose to run a business based on fraudulent lies and misrepresentations. . . . I know now that I am a pathological, narcissistic, self-centered fraudster.

(No. 13 Cr. 327, Sept. 5, 2014 Levitis Ltr. (Dkt. No. 125-1) at 35-36)  Levitis professed that he was "prepared for whatever sentence the Court may impose."  (Id. at 36)  Levitis also represented that, "[d]uring [his] years in prison, [he] intend[ed] to continue to deeply reflect on the crimes [he] ha[d] committed and continue to try to understand [his] motivations so that [he] can lead a good life when . . . released."  (Id.)

### b.      The Government's Sentencing Brief

In its November 13, 2014 sentencing brief, the Government recommended that the Court impose a Guidelines sentence.  (No. 13 Cr. 327, Govt. Sentencing Br. (Dkt. No. 134))

The Government observed that 230 victims had written letters to the Court,[4] and emphasized that Mission, "at Levitis's direction, knowingly advised [victims] not to pay their credit card bills . . . while Mission was supposedly working on their behalf[,] . . . resulting in serious and long-lasting effects on their financial ability to support themselves and their families."  (Id. at 3)  The Government noted that late in the scheme, "after the Consumer Financial Protection Bureau passed a regulation that made it more difficult to accept up-front fees from customers[] . . . , Levitis expanded his business to target Canadian customers[,] . . . [and] instructed his Brooklyn-based employees to use fake Canadian accents" in an effort to continue collecting up-front fees from customers.  (Id. at 13-14)

### c.   Levitis's Sentencing Reply Brief

On November 18, 2014, Charles A. Ross, Levitis's lawyer, submitted a sentencing reply brief.  (See No. 13 Cr. 327, Levitis Sentencing Reply Br. (Dkt. No. 139))  The reply brief does not object to anything in the PSR, and again "acknowledge[s] that [Levitis] committed the crimes to which he pleaded guilty."[5]  (Id. at 4)  But Ross argued that "the Government's recitation of Mr. Levitis' wrongdoing reveals a startling lack of comprehension of

---

[4]  The Government initially and inaccurately reported that "over 700" victims had submitted victim impact statements.  (No. 13 Cr. 327, Govt. Sentencing Br. (Dkt. No. 134) at 3)  In a letter filed the day after its sentencing brief, however, the Government corrected the misstatement, explaining that the correct figure was 230 and that "the number it originally provided, over 700, was inadvertently based on the number of pages that victims have submitted."  (No. 13 Cr. 327, Nov. 14, 2014 Govt. Ltr. (Dkt. No. 136))  By the time Levitis was sentenced, 250 victims had submitted victim impact statements.  (See No. 13 Cr. 327, Sentencing Tr. (Dkt. No. 164) at 46)

[5]  The defense reply brief states that Levitis "allowed and encouraged salespeople to lie to prospective customers during initial telephone conversations about Mission's fees.  Specifically, he allowed salespeople not to disclose that the quoted monthly payment amount included an 18 percent service fee.  He also allowed salespeople to state that there were no upfront fees.  Mr. Levitis allowed and encouraged Mission's salespeople to lie about Mission's success rate.  In addition, Mr. Levitis created and authorized marketing materials that falsely implied that Mission was affiliated with a government agency and that falsely represented that customers would not be charged upfront fees."  (No. 13 Cr. 327, Levitis Sentencing Reply Br. (Dkt. No. 139) at 4)

the mechanics of debt settlement. . . . [M]any of the hardships suffered by the victims in this case are virtually universal:  even where debt settlement companies make no misrepresentations, the majority of their customers have only a few of their debts settled and often experience additional financial hardships resulting from aggressive debt collection practices."  (Id. at 9)  Counsel urged the Court to sentence Levitis "for the crimes he actually committed and not for the noncriminal failings of the debt settlement industry."  (Id. at 10)

### 3.    Sentencing Proceeding

At his November 19, 2014 sentencing, Levitis confirmed that he had "read the presentence report and discussed it with Mr. Ross," his lawyer.  (No. 13 Cr. 327, Sentencing Tr. (Dkt. No.164) at 3)  When the Court asked Ross whether the Defendant had any objections to the factual portions of the PSR, counsel responded "[n]othing further than what we have already raised."  (Id.)  The Government had no objections.  (Id. at 4)  Accordingly, the Court adopted the factual findings set forth in the PSR.  (Id.)

As to the Guidelines calculations, the Court noted that although the PSR and the Plea Agreement contained a 3-level enhancement pursuant to U.S.S.G. § 3B1.1(b) – treating Levitis as a "manager or supervisor (but not an organizer or leader)" of the criminal activity – "[i]t seem[ed] . . . that Mr. Levitis was an organizer or leader of criminal activity[,] . . . [and] that, accordingly, under the sentencing guidelines, a 4-level enhancement should be imposed under Section 3B1.1(a)."  (Id. at 4)  The Court asked Levitis's lawyer and the Government why the 4-level enhancement did not apply.  (Id.)

Ross responded that "the 3-point enhancement was a product of negotiation with the government . . . . [B]oth parties felt that . . . this was a fair evaluation in the spirit of coming to an agreement in this case."  (Id. at 5)  The Government likewise stated that "this was the

subject of a lot of discussion between the parties. . . . [T]his was a very close question for the

government in thinking about the case.  On balance, we thought that Mr. Levitis could fall into

either category . . . and . . . negotiated the resolution we agreed to, the 3-level enhancement[,]

and thought that it would not . . . do violence to the guidelines."  (Id. at 9-10)

        After hearing from counsel, the Court stated that "it is very difficult . . . to find

that [Levitis] is not an organizer or leader of the criminal conduct here," and that it was "troubled

by [this aspect of] the [Plea] [A]greement."  (Id. at 12, 14)  The Court nevertheless concluded

that the Guidelines "allow[] for this resolution," and agreed to "honor the agreement that the

parties entered into."  (Id. at 14)  The Court therefore adopted the Guidelines calculations set

forth in the Plea Agreement and the PSR, and announced that it would apply the Guidelines

range of 87 to 108 months' imprisonment to which both sides had agreed.  (Id. at 15)[6]  The Court

then heard argument from counsel.

        Defense counsel emphasized certain points made in his written submissions,

including that Levitis had "undertake[n] measures that were an attempt to address some of the

egregious conduct of himself and of others who worked with him," albeit too late; that "many

clients . . . did have work done for them," and that "debt really was negotiated on behalf of many

clients[, and] was, for some, completely eliminated"; that Mission client contracts stated accurate

fees, although "clients were lied to about this [and] . . . were hustled through th[e] contract[s] and

didn't understand the nature of what they were signing"; and that although Levitis "encouraged

and supported illegal actions of his employees," "[m]any acted . . . independently for their own

---

[6]  Had the Court applied a 4-level enhancement pursuant to U.S.S.G. § 3B1.1(a), rather than the
3-level enhancement the parties had agreed to, Levitis's Guidelines range would have been 97 to
121 months' imprisonment.

self-interest." (Id. at 27, 30-35)  But defense counsel also acknowledged Levitis's guilt.  (Id. at 38)[7]

In addressing the Court, Levitis likewise acknowledged his guilt, stating "I know I am guilty."  (Id. at 44)  Levitis also said that he was "very grateful to . . . Mr. Ross" for his representation.  (Id. at 40)

After hearing from counsel and Levitis, the Court discussed in detail the nature and circumstances of Levitis's offenses, as well as his personal history and characteristics.  (Id. at 49-61)  The Court stated that Levitis's crimes were "special and extraordinary," because they "were directed at . . . desperate people drowning in debt, desperate to find a way out of their problem[s]," and caused "financial harm and emotional damage that . . . w[ould] continue for years to come . . . [and took place] in a context in which [Levitis] had no compelling need for the funds he stole."  (Id. at 54-55, 57-58)  The Court "conclud[ed] that a substantial period of imprisonment [was] necessary," and imposed an aggregate sentence of 108 months' imprisonment – the top of the applicable Guidelines range.  (Id. at 57-59)  The sentence was composed of 60 months' imprisonment on Count 1 of the (S1) Information, and 48 months' imprisonment on Count 2, with those terms to be served consecutively.  (See id. at 58-59; No. 13 Cr. 327, Judgment (Dkt. No. 146))

---

[7]  As to Count 2 of the (S1) Information, which addressed the fraud committed through Alpha Debt Settlement, defense counsel said:  "We don't dispute that there was a fraud that occurred at Alpha in Canada.  The government is right, there was this change of regulation and the Canada operation was opened up.  I can tell the Court that it is my understanding that all United States Mission clients after this change in regulation occurred in the United States were required to physically appear in the office in order to discuss the charging of an upfront fee and that Alpha employees, the Canadian employees, were the employees who were actually here in New York who were answering the virtual office phones of the Canadian operation, were instructed [not] to tell customers that this was a United States business.  I am not making any excuses . . . [t]here was fraud in Alpha."  (Id. at 35)

At the close of the sentencing proceeding, the Court and counsel discussed a surrender date and the conditions that should govern Levitis's continued release pending his surrender.  (No. 13 Cr. 327, Sentencing Tr. (Dkt. No.164) at 63-64)  In arguing that Levitis was not a flight risk, defense counsel stated that – while he had argued for a 60-month sentence – he had "told Mr. Levitis that the likelihood that your Honor, given the circumstances of this offense . . . [would] impose a 60-month sentence was pretty remote.  So he came here with the full knowledge that he would likely receive a guideline sentence.  And [counsel] certainly did not advise him that he was going to be looking at a low end guideline sentence, given his previous criminal record."  (No. 13 Cr. 327, Sentencing Tr. (Dkt. No. 164) at 65)

Judgment was entered on November 24, 2014.  (No. 13 Cr. 327, Judgment (Dkt. No. 146))

### D.    Direct Appeal

Levitis, through his attorney, Charles A. Ross, filed a notice of appeal on November 25, 2014, less than a week after sentencing and one day after judgment was entered.  (See No. 13 Cr. 327, Notice of Appeal (Dkt. No. 148))  On March 31, 2015, Levitis – then represented by new counsel – withdrew his appeal with prejudice.  (See United States v. Levitis, No. 14-4417 (2d Cir.) (Dkt. Nos. 48, 53))

### E.    Levitis's Petition

Levitis filed the instant petition on November 16, 2015.  (See No. 15 Civ. 8977, Pet. (Dkt. No. 1))  Levitis acknowledges that in the Plea Agreement he waived his right to appeal or collaterally attack a sentence within the stipulated Guidelines range, but he contends that his waiver should not be enforced.  (See id. at 13)  Levitis further argues that his lawyer, Charles Ross, was constitutionally ineffective in (1) advising Levitis to plead guilty and enter into the

Plea Agreement; (2) failing to object to purported deficiencies in the wire fraud conspiracy

charge, Count 2 of the (S1) Information; (3) failing to dispute a three-level role in the offense

enhancement imposed pursuant to U.S.S.G. § 3B1.1(b); and (4) failing to object to certain

alleged factual errors in the PSR.[8]  (Id. at 15-21)

## DISCUSSION

## I.    LEGAL STANDARDS

### A.    28 U.S.C. § 2255

28 U.S.C. § 2255 provides, in relevant part, that "[a] prisoner in custody under

sentence of a [Federal] court . . . claiming the right to be released upon the ground that the

sentence was imposed in violation of the Constitution or laws of the United States . . . or that the

---

[8]  In his reply brief, Levitis also suggests that Ross had an "inherent conflict of interest in representing both Mission . . . and Michael Levitis at the outset of the case and . . . at the sentencing stage."  (See No. 15 Civ. 8977, Reply (Dkt. No. 13) at 5)  As an initial matter, Levitis has waived this argument by raising it for the first time in his reply brief.  See Farmer v. United States, No. 12-CR-758, 2017 WL 3448014, at *3 (S.D.N.Y. Aug. 10, 2017) (denying motion to reconsider ruling that Section 2255 petitioner waived arguments first raised in reply brief, and stating that "[c]ourts have repeatedly held that arguments raised for the first time in reply briefs are waived, and courts have routinely applied this rule to pro se litigants").  In any event, Levitis's conflict argument has no merit.  Although Levitis contends that "the record establishes that Mr. Ross represented both Mr. Levitis and Mission from the outset" (No. 15 Civ. 8977, Reply (Dkt. No. 13-4) at 6), Mission retained separate counsel, Susan Kellman.  (No. 13 Cr. 327, Notice of Appearance (Dkt. No. 68))  After Mission pled guilty, Kellman sought to withdraw, representing that she "ha[d] discussed this matter with [her] client and with Mr. Levitis and his attorney Charles Ross and all concur that any concerns regarding a potential conflict no longer pose a challenge to the singular representation by Mr. Ross of both Mr. Levitis and Mission Settlement Agency."  (No. 13 Cr. 327, June 12, 2014 Ltr. Mot. (Dkt. No. 106))  Levitis – who is a lawyer himself – did not object to the joint representation.  And Levitis does not now explain how Ross's post-plea representation of both himself and Mission created an actual conflict, nor has he demonstrated that any such alleged conflict affected Ross's performance.  See United States v. Schwarz, 283 F.3d 76, 91 (2d Cir. 2002) ("[A] defendant claiming he was denied his right to conflict-free counsel . . . need . . . establish (1) an actual conflict of interest that (2) adversely affected his counsel's performance. . . . An attorney has an actual . . . conflict of interest when, during the course of the representation, the attorney's and defendant's interests diverge with respect to a material factual issue or legal issue or to a course of action." (internal quotation marks and citation omitted)).  Levitis has shown no such conflict here.

sentence . . . is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence."  28 U.S.C. § 2255(a).  "Relief under section 2255 is available only 'for constitutional error, lack of jurisdiction, or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice.'" Rosa v. United States, 170 F. Supp. 2d 388, 396 (S.D.N.Y. 2001) (quoting Graziano v. United States, 83 F.3d 587, 589-90 (2d Cir. 1996) (internal quotation marks and citations omitted)).

In ruling on a Section 2255 motion, the district court need not conduct an evidentiary hearing where "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255(b).  "To warrant a hearing, the movant 'must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle [the movant] to relief.'" Mann v. United States, No. 15 Cr. 667-4 (KPF), 2016 WL 5900174, at *7 (S.D.N.Y. Oct. 11, 2016) (quoting Gonzalez v. United States, 722 F.3d 118, 131 (2d Cir. 2013)).  However, "[a] court need not . . . credit factual assertions contradicted by evidence in the record of the underlying proceeding," and "when the judge who tried the underlying proceedings also presides over a § 2255 motion, a full-blown evidentiary hearing may not be necessary."  (Id. (internal quotation marks and citations omitted))

**B.**   **Ineffective Assistance of Counsel**

Courts analyze ineffective assistance of counsel claims under the framework the Supreme Court set out in Strickland v. United States, 466 U.S. 668 (1984).  "In order to prevail on a claim of ineffective assistance of counsel within [the Strickland] framework . . . , a habeas petitioner must satisfy a two-part test."  Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994). The petitioner "'must demonstrate both "that counsel's performance was deficient" and "that the

deficient performance prejudiced the defense."'" Garner v. Lee, 908 F.3d 845, 861 (2d Cir. 2018) (quoting Waiters v. Lee, 857 F.3d 466, 477 (2d Cir. 2017) (quoting Strickland, 466 U.S. at 687))).

"The performance component of the Strickland test asks whether a 'counsel's representation fell below an objective standard of reasonableness.'" Kovacs v. United States, 744 F.3d 44, 50 (2d Cir. 2014) (quoting Strickland, 466 U.S. at 688).  "A defense counsel's performance is unreasonable when it is so deficient that it falls outside the 'wide range of professionally competent assistance.'" Id. (quoting Strickland, 466 U.S. at 690).  "When assessing counsel's performance, a court 'must judge his conduct on the basis of the facts of the particular case, "viewed as of the time of counsel's conduct," and may not use hindsight to second-guess his strategy choices.'" Muniz v. United States, 360 F. Supp. 2d 574, 578 (S.D.N.Y. 2005) (quoting Mayo, 13 F.3d at 533 (quoting Strickland, 466 U.S. at 690)); see also Parisi v. United States, 529 F.3d 134, 141 (2d Cir. 2008) (warning of the risk that "in the illuminating light of hindsight, [courts] might look back and project ex post knowledge of consequences on the attorney's ex ante selection of one path among the many available to him"). Accordingly, courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Parisi, 529 F.3d at 141 (internal quotation marks and citation omitted).

To establish prejudice under the second Strickland prong, a defendant "must demonstrate 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Garner, 908 F.3d at 861-62 (quoting Strickland, 466 U.S. at 694)).

II.   **ANALYSIS**

A.   **Enforceability of the Plea Agreement's Collateral Attack Waiver**

In the Plea Agreement, Levitis agreed that he would "not file a direct appeal; nor bring a collateral challenge, including but not limited to an application under Title 28, United States Code, Section 2255 . . . of any sentence within or below the Stipulated Guidelines Range of 87 to 108 months' imprisonment."  (Plea Agmt. at 5)[9]  Although this Court sentenced Levitis to 108 months' imprisonment – a sentence within the Stipulated Guidelines Range – he contends that his waiver is unenforceable.

According to Levitis, in an October 14, 2014 memorandum, then-Deputy Attorney General James M. Cole directed prosecutors (1) not to include in plea agreements provisions in which defendants waived their right to bring an ineffective assistance claim on collateral attack; and (2) not to enforce existing waivers in certain circumstances.  (See No. 15 Civ. 8977, Pet. (Dkt. No. 1) at 13-14; No. 15 Civ. 8977, Reply Dkt. No. 13) at 2-3)  Levitis argues that this Department of Justice memorandum (the "Cole Memo") bars enforcement of the waiver in the Plea Agreement.  (Id.)

Levitis also argues that he did not enter into the Plea Agreement knowingly and voluntarily, because he did not have "sufficient knowledge regarding the merits or legality of the [collateral attack] waiver."  (No. 15 Civ. 8977, Reply (Dkt. No. 13) at 8-9)

Neither argument is persuasive.

"There is no general bar to a waiver of collateral attack rights in a plea agreement."  Frederick v. Warden, Lewisburg Corr. Facility, 308 F.3d 192, 195 (2d Cir. 2002);

---

[9]  The Government likewise agreed that it would "not appeal any sentence within or above the Stipulated Guidelines Range."  (Id.)

see Garcia-Santos v. United States, 273 F.3d 506, 509 (2d Cir. 2001) ("We have long enforced waivers of direct appeal rights in plea agreements. . . . The reasons for enforcing waivers of direct appeal . . . lead us to the same conclusion as to waivers of collateral attack under § 2255." (citation omitted)).  The Cole Memo – which was issued more than six months after Levitis entered into the Plea Agreement – does not effect a change in this case law.

The Cole Memo provides, in pertinent part, that

> [w]hen negotiating a plea agreement, the majority of United States Attorney's Offices do not seek a waiver of claims of ineffective assistance of counsel.  This is true even though the federal courts have uniformly held a defendant may generally waive ineffective assistance claims pertaining to matters other than the plea itself, such as claims related to sentencing.  While the department is confident that a waiver of a claim of ineffective assistance of counsel is both legal and ethical, in order to bring consistency to this practice, and in support of the underlying Sixth Amendment right we now set forth uniform Department of Justice policies relating to waivers of claims of ineffective assistance of counsel.

> Federal prosecutors should no longer seek in plea agreements to have a defendant waive claims of ineffective assistance of counsel whether those claims are made on collateral attack or . . . made on direct appeal.  For cases in which a defendant's ineffective assistance claim would be barred by a previously executed waiver, prosecutors should decline to enforce the waiver when defense counsel rendered ineffective assistance resulting in prejudice or when the defendant's assistance claim raises a serious debatable issue that a court should resolve.

(No. 15 Civ. 8977, Cole Memo (Dkt. No. 13-4) at 11 (emphasis added))

The Cole Memo does not broadly prohibit the Government from enforcing collateral attack waiver provisions entered into before the Memo was issued.  Instead, the Cole Memo directs prosecutors not to enforce such waiver provisions where (1) prosecutors believe that "defense counsel rendered ineffective assistance resulting in prejudice"; or (2) when "the defendant's assistance claim raises a serious debatable issue that a court should resolve."  (Id.) Here, the Government asserts that "[n]one of Levitis's allegations about his attorney's performance are remotely sufficient to overcome [his waiver]."  (No. 15 Civ. 8977, Govt. Opp.

Br. (Dkt. No. 7) at 2; see id. at 15, 18, 21, 22 (characterizing Levitis's arguments as

"nonsensical"; "utterly meritless"; "specious"; and "frivolous"))  Accordingly, under the

circumstances here, the Cole Memo presents no bar to the Government seeking to enforce the

waiver provision.

   Other courts in this Circuit confronting similar circumstances have reached the

same conclusion.  See Sanders v. United States, No. 15-CV-2808 (LAK), 2016 WL 3671360, at

*12 (S.D.N.Y. July 5, 2016) ("The [Cole Memo] does no more than instruct U.S. Attorney

Offices not to seek the waiver of [ineffective assistance claims] when negotiating plea

agreements. . . . [T]he memorandum emphasizes that 'the Department is confident that a waiver

of a claim of ineffective assistance of counsel is both legal and ethical' and that the purpose of

the Department's policy simply is to 'bring consistency' to the practice of U.S. Attorney's

offices nationwide." (citations omitted)); Cavounis v. United States, No. 11-CR-297 (VEC),

2016 WL 715768, at *5 (S.D.N.Y. Feb. 19, 2016) ("Petitioner's reliance on the [Cole Memo] is

misplaced because the Justice Department's policy statement is not controlling law and does not

bind this Court.  Moreover, the [Cole Memo] instructs prosecutors not to enforce waivers in only

two specific circumstances, neither of which is present in Petitioner's case." (citing United States

v. Reed, 576 F. App'x 60, 61-62 (2d Cir. 2014) ("[P]olicy statements and guidance [do] not

legally bind prosecutors or . . . the courts."));  see also Spaulding v. United States, No.

3:12CV1264 (AWT), 2015 WL 5601842, at *10 & n.3 (D. Conn. Sept. 23, 2015) (holding that

"petitioner's motion to vacate, set aside or correct his sentence . . . fails because the petitioner

waived his right to collaterally attack his sentence"; finding Cole Memo inapplicable because

"petitioner's claim . . . does not raise a serious debatable issue").

The result is the same in other Circuits.  See, e.g., United States v. Torres-Estrada, 817 F.3d 376, 378-79 (1st Cir. 2016) ("The government . . . correctly reminds us that such a policy [as the Cole Memo], promulgated after the plea agreement in this case, creates no rights in defendants and that courts typically play no role in the prosecutorial choices made by the [Department of Justice]."); Demello v. United States, 623 F. App'x 969, 972-73 (11th Cir. 2015) ("On at least three occasions since th[e] new policy was announced [in the Cole Memo], . . . the government has withdrawn its reliance on a defendant's collateral-attack waiver in a pending appeal.  As a result, we have vacated the judgments denying § 2255 relief and remanded those cases . . . . Here, however, . . . the government has not withdrawn its reliance on Demello's collateral-attack waiver. . . . The new policy does not prohibit prosecutors from seeking to enforce a collateral-attack waiver, so Demello's contention that the policy renders the waiver null and void is unavailing.").

In sum, the Cole Memo does not void Levitis's waiver or otherwise affect the general rule that defendants may, in their plea agreements, waive their right to bring a collateral challenge attacking their sentence.

Although the Cole Memo does not bar enforcement of Levitis's waiver, "a waiver of . . . collateral attack rights does not foreclose an attack on the validity of the process by which the waiver has been procured."  Frederick, 308 F.3d at 195.  "To raise a[n ineffective assistance] claim despite . . . [such a] waiver, the petitioner must show that the plea agreement was not knowing and voluntary, . . . because 'the advice he received from counsel was not within acceptable standards.'"  Parisi, 529 F.3d at 138 (quoting United States v. Torres, 129 F.3d 710, 715-16 (2d Cir. 1997) (internal citation omitted)).

23

An agreement is "knowing" where "the defendant fully understood the potential consequences of his waiver." United States v. Monzon, 359 F.3d 110, 116 (2d Cir. 2004). "In determining whether a defendant understood the consequences of a waiver, the district court is 'entitled to rely upon the defendant's sworn statements, made in open court . . . , that he understood . . . that he was waiving his right'" to collaterally attack his sentence. See United States v. Martinez, No. 09-CR-1022 KMK, 2014 WL 7146846, at *6 (S.D.N.Y. Dec. 12, 2014) (quoting United States v. Hernandez, 242 F.3d 110, 112-13 (2d Cir. 2001)).

Here, Levitis "challenge[s] the legitimacy of the advice of counsel that he received that resulted in the execution of the plea agreement" (No. 15 Civ. 8977, Pet. (Dkt. No. 1) at 14), and contends that, as a result of counsel's advice, his plea was not knowing and voluntary. (No. 15 Civ. 8977, Reply (Dkt. No. 13) at 8) Levitis points primarily to the purported "fact that [he] executed the plea agreement in spite of the existence of the DOJ's prohibition against such waivers," which he maintains "establishes that he executed the plea agreement without the requisite knowledge[,] and as such, his acquiescence was not voluntary." (Id.; see also id. at 8-9 ("[T]he record establishes that [Levitis] did not have sufficient knowledge regarding the merits or legality of the [collateral attack] waiver. . . . Moreover . . . it is clear that the government induced Mr. Levitis to acquiesce to the collateral attack waiver by concealing the new policy as set forth in the [Cole Memo].")

This argument is nonsense. Levitis executed the Plea Agreement on April 9, 2014. The Cole Memo was not issued until October 14, 2014. Accordingly, Levitis's counsel would have to have been clairvoyant to predict – in April 2014 – that the Cole Memo would be issued in October 2014. Strickland does not require clairvoyance. The fact that the Department of Justice initiated a new policy after Levitis entered into the Plea Agreement does not mean that

Levitis's agreement was not knowing and voluntary.  Indeed, the Second Circuit has repeatedly

held that changes in the law do not vitiate waivers in a plea agreement.  See United States v.

Haynes, 412 F.3d 37, 39 (2d Cir. 2005) ("[A]ppeal waivers are applicable to issues arising

subsequent to the plea agreement, including issues created by new judicial decisions.  We [have]

noted that the possibility of changes in the law is simply one of the risks allocated by the parties'

agreement."); United States v. Harrison, 699 F.3d 158, 159 (2d Cir. 2012) ("[The Second

Circuit's] 'cases foreclose the possibility that a plea agreement can be nullified by a change in

law after the agreement is executed:  A defendant's "inability to foresee that subsequently

decided cases would create new appeal issues does not supply a basis for failing to enforce an

appeal waiver."'" (quoting United States v. Riggi, 649 F.3d 143, 150 n.7 (2d Cir. 2011) (quoting

United States v. Morgan, 406 F.3d 135, 137 (2d Cir. 2005))).  These cases apply with even

greater force to changes in prosecutorial policies.

       At his plea proceeding, Levitis – an experienced lawyer – confirmed that he had

read and fully understood all of the terms of the Plea Agreement (see No. 13 Cr. 327, Plea Tr.

(Dkt. No. 102) at 22), and specifically confirmed that he understood that "so long as [the Court]

sentence[s] [him] to 108 months of imprisonment or less, [he] may not appeal [his] sentence or

file any collateral attack challenging the legality of [his] sentence." (Id. at 24-25)  In light of

Levitis's "sworn statements, made in open court . . . , that he understood . . .  that he was waiving

his right" to collaterally attack his sentence, see United States v. Martinez, 2014 WL 7146846, at

*6 (internal quotation marks and citation omitted), Levitis has not demonstrated that he did not

understand this aspect of the Plea Agreement.

       Construed liberally, the Petition appears to present another reason why Levitis did

not enter into the Plea Agreement knowingly and voluntarily:  Levitis claims that his lawyer

initially represented that his case was "winnable," and convinced him to reject a prior plea offer that stipulated to a lower Guidelines range.  (No. 15 Civ. 8977, Pet. (Dkt. No. 1) 15)  This plea offer allegedly did not include a 3-level role in the offense enhancement pursuant to U.S.S.G. § 3B1.1(b).  (Id. at 16)  After Ross submitted a pretrial motion, however, the Government allegedly became "perturbed," and told Levitis that he had to accept the more "draconian plea agreement," or go to trial.  The Government allegedly threatened that if Levitis was convicted at trial, it "would seek a 30-year prison sentence."  (Id.)  At this point, Ross told Levitis that – "despite no new factual evidence" – "the case could not be won."  (Id.)  This argument is likewise not persuasive.

To the extent Levitis suggests that his lawyer rendered ineffective assistance of counsel by advising him not to accept the first plea offer – which Levitis describes only as an offer that did not include the 3-level role in the offense enhancement, and which contemplated a sentencing range of six to seven years' imprisonment, rather than seven to nine years' imprisonment (see id. at 15-16) – Levitis must demonstrate that "but for the ineffective advice . . . there is a reasonable probability that the plea offer would have been presented to the court . . . , that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed."  Lafler v. Cooper, 566 U.S. 156, 164 (2012).  Levitis has made no such showing.

As an initial matter, the Government represents that the plea offer Levitis accepted "was the only written plea offer issued by the Government to Levitis."  (No. 15 Civ. 8977, Govt. Opp. Br. (Dkt. No. 7) at 22 n.1)  Levitis does not dispute this assertion in his reply papers.  Courts have rejected attempts "to extend Lafler to an informal plea offer . . . as the

distinction between formal plea offers and informal plea offers is significant."  Mavashev v. United States, No. 11-CV-3724 DLI, 2015 WL 1508313, at *9 (E.D.N.Y. Mar. 31, 2015); see Samet v. United States, 559 F. App'x 47, 49 (2d Cir. 2014) (rejecting ineffective assistance of counsel claim premised on allegation that defense counsel did not inform defendant of prior plea offer where petitioner offered evidence "only that [counsel] failed to inform [him] about certain informal plea negotiations . . . which did not result in the extension of a formal plea offer").

Even if the Lafler framework applied here, Levitis has not shown that "the plea offer would have been presented to the court," that "the court would have accepted its terms, and that the conviction or sentence . . . would have been less severe than under the judgment and sentence that in fact were imposed."  Lafler, 566 U.S. at 164.  The only difference between the plea Levitis accepted and the earlier plea he was allegedly offered is the three-level role in the offense enhancement under U.S.S.G. § 3B1.1(b).[10]  Given (1) the Court's concern at sentencing that the Guidelines required a four-level role in the offense enhancement rather than the three-level enhancement agreed to by the parties, and (2) Levitis's leadership role in the scheme, it is inconceivable that the Court would have imposed no role in the offense enhancement.  (See No. 13 Cr. 327, Sentencing Tr. (Dkt. No.164) at 4-15)

To the extent Levitis contends that Ross somehow rendered ineffective assistance because his "view regarding the government's evidence [had] changed despite [there being] no new evidence," and because he "insisted that Mr. Levitis sign the plea ahead of the Court ever ruling on [his pretrial] motion[s,]" (No. 15 Civ. 8977, Pet. (Dkt. No. 1) 16), these contentions are belied by the record and by Levitis's sworn statements during the Rule 11 proceeding.

---

[10]  Without the three-level role in the offense enhancement, Levitis's Guidelines sentencing range would have been 63 to 78 months' imprisonment, reflecting a total offense level of 25 at Criminal History Category II.

Contrary to Levitis's representations, the strength of the Government's case increased significantly in the weeks leading up to Levitis's plea.  Levitis's co-defendant, Boris Shulman, pled guilty on February 14, 2014, pursuant to a cooperation agreement with the Government.  In his plea allocution, Shulman directly implicated Levitis (see No. 13 Cr. 327, Shulman Plea Tr. (Dkt. No. 77) at 12 ("I was instructed to make false statements by people I worked for[,] including Michael Levit[is]. . . .").  As the Government explained at Shulman's sentencing, Shulman "would have been a very important witness at trial . . . against . . . Levitis . . . . He provided highly detailed and corroborated information relating to, among other things, the use of a sales script he received from Levitis, about Levitis' understanding that the debt settlement program made no sense for customers, and that certain debts were not capable of being settled at the rate that Mission promised its customers."  (No. 13 Cr. 327, Shulman Sentencing Tr. (Dkt. No. 194) at 21; see also id. at 28 (this Court's finding that "[i]t seems likely that Mr. Shulman's cooperation contributed to the decision of Levitis . . . to plead guilty"))

In any event, Levitis swore at his plea proceeding that he was pleading guilty "voluntarily and of [his] own free will," and that no one had "offered [him] any inducements or threatened [him] or forced [him] to plead guilty or enter into this plea agreement."  (No. 13 Cr. 327, Plea Tr. (Dkt. No. 102) at 24, 28)  This Court is "entitled to rely upon [these] sworn statements."  Hernandez, 242 F.3d at 112; see also Blackledge v. Allison, 431 U.S. 63, 73-74 (1977) ("solemn declarations in open court" – including "the representations at a [plea] hearing" – "carry a strong presumption of verity").

The Court concludes that Levitis entered into the Plea Agreement knowingly and voluntarily, and that its terms, including the collateral attack waiver, are enforceable. Accordingly, the claims Levitis raises in his motion have been waived.[11]

As discussed below, even if Levitis's additional arguments had not been waived, they fail on their merits.

### B.   Ineffective Assistance of Counsel Claim Premised on Count Two of the (S1) Information

Count 2 of the (S1) Information charges Levitis with conspiracy to commit wire fraud, and alleges that he "engaged in a scheme to defraud customers of Alpha Debt Settlement . . . by, among other things, making misrepresentations about Alpha's fees, results, and affiliations."  (No. 13 Cr. 327, (S1) Information (Dkt. No. 86) ¶ 6)  The (S1) Information alleges that "[o]n or about May 11, 2012," in furtherance of this scheme, Levitis "sent an e-mail to employees of Alpha instructing them to make certain misrepresentations to prospective customers on behalf of Alpha."  (Id. ¶ 7)

According to the Government, "Alpha was essentially another name for Mission." (No. 13 Cr. 327, Govt. Opp. Br. (Dkt. 60) at 23 n.8; see also No. 13 Cr. 327, Indictment (Dkt. No. 1) ¶ 1 (identifying "Alpha Debt Settlement" as an "a/k/a" of Mission))  According to Levitis's counsel, Mission and Alpha – both of which Levitis "controlled and operated" –

---

[11]  The Government argues that even if the Plea Agreement's waiver did not bar Levitis's claims, "any challenge to his sentence has been procedurally defaulted," since under "the procedural default doctrine . . . absent a showing of cause and prejudice, a habeas petitioner may not raise any arguments not raised on direct appeal."  (No. 15 Civ. 8977, Govt. Opp. Br. (Dkt. No. 7) at 2, 5)  The Supreme Court has expressly held, however, that "failure to raise an ineffective-assistance-of-counsel claim on direct appeal does not bar the claim from being brought in a later . . . proceeding under § 2255."  Massaro v. United States, 538 U.S. 500, 509 (2003).

"operated out of the same office and employed the same personnel."  (No. 13 Cr. 327, Levitis Sentencing Br. (Dkt. No. 125) at 3 n.1)[12]

During the time that Levitis operated his fraudulent scheme, the Consumer Financial Protection Bureau promulgated a regulation that made it more difficult for debt settlement companies to accept up-front fees from customers.  (No. 13 Cr. 327, Govt. Sentencing Br. (Dkt. No. 134) at 13)  In response, Levitis "expanded his business to target Canadian customers in the hopes that he could easily continue collecting substantial up-front fees from them."  (No. 13 Cr. 327, Govt. Sentencing Br. (Dkt. No. 134) at 13-14)

On May 11, 2012, Levitis sent an email to Alpha employees with the subject "Canada Training."  (See No. 15 Civ. 8977, May 11, 2012 E-mail (Dkt. No. 1) at 40)  The email states:

Canada Training

1) We are located in Toronto, Canada at 1 Yonge Street, Suite 1801.  Phone number to Customer Service 800-655-5759, Fax 416-981-3536, Email customerservice@alphasettle.ca,

Website www.AlphaSettle.ca, Comapny [sic] is called Alpha Debt Settlement Services Canada, Inc. and it is a Canadian company that is registered to do business in Canada.

---

[12]  It appears that the Government became aware of Alpha as a result of a search warrant executed at Mission's offices.  (See No. 13 Cr. 327, Supp. App. for Search Warrant (Dkt. No. 55-8) at 4-6 (explaining that "[i]n the course of searching for and seizing the items identified in [a previous search warrant for Mission's offices], other [United States Postal Inspection Service] agents have identified documents and files referencing 'Alpha Debt Settlement' that are mixed in and among the Mission documents and files," including "contracts, customer files and employee 1099 tax reporting forms for Alpha Debt Settlement" similar to those for Mission; and stating that "from performing an internet search of Alpha Debt Settlement," the swearing agent "know[s] . . . that Alpha Debt Settlement purports to perform . . . the same service as Mission, . . . [and has] the same phone number [as Mission][;] . . . the address provided . . . for  Alpha Debt Settlement on its web site . . . is an address . . . previously claimed to be Mission's office"[; and] . . . bank records . . . reveal that . . . [an] Executive of Mission . . . is . . . the sole signatory on a back account in the name 'Alpha Debt Settlement'")

2)  We do business for now only in Ontario and British Columbia Provinces.

3)  We do not have attorneys in canada [sic] for now so do not say anything about legal representation.  We will have in the future.

4)  Global's company in Canada is called TEC (Transaction Express Canada).  They work the same as Global.

4)  [sic] On top of our fees and escrow, every month the clients will have to pay sales tax on our fee only, not on the escrow.  Sales tax in Canada is called GST and HST Tax.  It is 13% in Ontario and 12% in British Columbia[.]

5)  If clients want to come to our office in Toronto – it is a virtual office only.  Make sure they do not go there.  If pressed explain that we are based out of Madison Avenue in NYC.

6)  After the clients sign the Esign contract there will be other forms that they will need to sign for TEC to withdraw money from their account.  You will be provided with such forms that you will email to clients.

7)  Make sure you do not say anything American and that you sound Canadian.  Do not mention any American laws, agencies etc.[]  Also, in Canada they do not have states – they have provinces.  Letter "Z" is pronounced as 'Ze'.

(Id. at 40-41)

During Levitis's plea proceeding, he testified that, "from about 2011 through 2013, [he] . . . operated Alpha Debt Settlement, also a debt settlement company," and "agreed with other employees of the company to defraud Alpha Debt Settlement customers by making misrepresentations about Alpha's fees and results, among other things . . . for the purpose of obtaining money and property."  (No. 13 Cr. 327, Plea Tr. (Dkt. No. 102) at 27)  Levitis also testified that, in furtherance of this fraudulent scheme, "on May 11, 2012, [he] knowingly sent an e-mail to certain Alpha employees in which [he] instructed the employees to make misrepresentations to Alpha customers."   (Id.)

Levitis now contends that the wire fraud conspiracy charge he pled guilty to concerns "Alpha Debt Settlement Inc.[,] or 'Alpha USA,'" and that "the only act that is [cited]

by either the Probation Office [in the PSR] or mentioned at [his] sentencing hearing . . . related to Alpha Debt Settlement Services Canada Inc. or 'Alpha Canada'" – "a separate company from that of Alpha USA."  (No. 15 Civ. 8977, Pet. (Dkt. No. 1) at 15)  According to Levitis, his conviction on Count 2 was thus "for a crime for which it is a legal impossibility to have occurred as adjudicated," and his lawyer was constitutionally ineffective in "fail[ing] to object to or even address this issue" with the Probation Office, the Government, or this Court.  (Id.)

This argument is absurd.  The distinction Levitis makes between "Alpha USA" and "Alpha Canada" – a distinction never articulated by anyone during Levitis's criminal proceedings – does not show that the offense to which he pled guilty was a "legal impossibility."

"Alpha Debt Settlement, Inc." was incorporated in New York in 2009.  (See No. 15 Civ. 8977, Pet. (Dkt. No. 1) at 35)  "Alpha Debt Settlement Services Canada Inc." was incorporated in British Columbia on February 23, 2012.  (Id. at 38)  The latter is a "separately incorporated [company], in a separate jurisdiction, [with] . . . separate clientele" (id. at 15), but Levitis created the Canadian company in order to evade U.S. regulations and further his ongoing criminal scheme.  Indeed, Levitis's May 11, 2012 email makes clear that the Alpha entity incorporated in New York in 2009 and the entity incorporated in British Columbia in 2012 are part of the same fraudulent operation.  The email provides details about the "new" company to the employees of the previously existing entity and states that Alpha's presence in Canada is merely "virtual," and that Alpha remains, in reality, "based . . . in NYC."  (Id. at 41)[13]

_____

[13]  Levitis appears to suggest that his May 11, 2012 email cannot serve as an overt act for purposes of the wire fraud conspiracy.  He argues that "to hold that [Levitis's directives in the email, including concealing that Alpha's employees were American, and not Canadian] constitute[] fraud[] would be to turn universally accepted business practices on their head. . . . [C]ountless . . . major corporations in the United States[] have used [foreign] call centers . . . [at which employees use] American sounding names, adopt[] faux American accents, and in some instances even pretend[] to be domiciled in American soil."  (No. 15 Civ. 8977, Pet. (Dkt. No. 1)

In sum, Levitis has not demonstrated any infirmity in Count 2 of the (S1) Information, much less that his lawyer provided ineffective assistance of counsel in connection with this charge.

### C.   Ineffective Assistance of Counsel Claim Premised on Role in the Offense Enhancement

Levitis argues that his lawyer was constitutionally ineffective in stipulating to a three-level role in the offense enhancement pursuant to U.S.S.G. § 3B1.1(b).  According to Levitis, "based on the existing record before the court, [this enhancement] was not proven in accordance with law."  (No. 15 Civ. 8977, Pet. (Dkt. No. 1) at 17)

A three-level role in the offense enhancement applies where a defendant is "a manager or supervisor" of "criminal activity [that] involved five or more participants or was otherwise extensive."  U.S.S.G. § 3B1.1(b).  Levitis maintains that "nowhere in the existing record[] is there any evidence that the conspiracy extended beyond the . . . [four defendants] identified in the indictment, presentencing report and plea agreement."  (No. 15 Civ. 8977, Pet. (Dkt. No. 1) 17)  Levitis also complains that his lawyer stipulated that Levitis was a "manager in the conspiracy," knowing that this was false.  (Id. at 28)

Levitis's claims have no merit.  As an initial matter, Levitis knowingly and voluntarily entered into the Plea Agreement, in which he stipulated to this enhancement. Generally, "[s]tipulations made knowingly and voluntarily are enforceable," Kapelioujnyi v.

---

19)  Whether the conduct outlined in Levitis's email – standing alone – constitutes fraud is irrelevant, however, because "an overt act need not be criminal to satisfy the overt act requirement."  Melia v. United States, 667 F.2d 300, 304 n.4 (2d Cir. 1981) (citing United States v. Winter, 509 F.2d 975, 982 ("An overt act, seemingly innocent in itself yet in furtherance of the conspiracy, is sufficient under the law of conspiracy."), cert. denied, 423 U.S. 825 (1975)); see also United States v. Montour, 944 F.2d 1019, 1026 (2d Cir. 1991) ("[A]n overt act need not be inherently criminal to support a conspiracy conviction.").

<u>United States</u>, 779 F. Supp. 2d 250, 254 (E.D.N.Y. 2009), <u>aff'd</u>, 422 F. App'x 25 (2d Cir. 2011),

and "courts may rely on them 'in finding facts relevant to sentencing.'" <u>Id.</u> (quoting <u>United</u>

<u>States v. Granik</u>, 386 F.3d 404, 411 (2d Cir. 2004)).  Moreover, because "factual stipulations are

bargaining chips in the hands of defendants," <u>Granik</u>, 386 F.3d at 412, courts have rejected

ineffective assistance claims premised on an attorney's failure to object to sentencing

enhancements, as "counsel's decision not to object to the enhancements may have been a

strategic decision employed to secure the plea agreement."  <u>Kapelioujnyi</u>, 779 F. Supp. 2d at

255.  In any event, the factual basis for the role in the offense enhancement here is abundantly

clear.

Levitis's criminal activity involved at least six participants:  Levitis; his co-

defendants Kurlyand, Shulman, and Cruz; and Felix Lemberskiy and Zhakir Shirinov,

cooperating witnesses whose cases proceeded before other judges.  Both Lemberskiy and

Shirinov pled guilty to charges stemming from their involvement in the Mission scheme.  (<u>See</u>

<u>United States v. Lemberskiy</u>, 13 Cr. 325 (RA), Information (Dkt. No. 2) ¶ 2 (alleging that

"[f]rom in or about June 2009 through in or about January 2013," Lemberskiy "was employed as

a sales representative" at Mission, and that while employed at Mission, he "defrauded customers

by fraudulently inducing them to enter into contracts with Mission by, among other things, lying

to them about Mission's fees"); <u>United States v. Shirinov</u>, 13 Cr. 319 (DLC), Information (Dkt.

No. 2) ¶ 2 (alleging that Shirinov engaged in the same conduct from July 2009 to September

2012))  Indeed, Levitis's own submissions to this Court refer to Lemberskiy and Shirinov's

involvement in the Mission scheme.  (<u>See</u>, <u>e.g.</u>, No. 13 Cr. 327, Levitis Reply Br. (Dkt. No. 67)

at 8 (arguing, in reply to the Government's opposition to Levitis's motion for a <u>Franks</u> hearing,

that the Government should have obtained information relevant to its search warrant application

from "two former employees of Mission, Felix Lemberskiy and Zakhir Shirinov, [who] were cooperating with the government at that time"))

As to Levitis's role as a "manager or supervisor," he asserts that Kurlyand had more direct contact with Mission salespeople, and thus was "far more culpable for the day-to-day activities of the sales team responsible for malfeasance than [Levitis]." (No. 15 Civ. 8977, Pet. (Dkt. No. 1) 29) Even assuming arguendo that this characterization is accurate, application of the role in the offense enhancement does not turn on which defendant had the most contact with lower-level co-conspirators, or which defendant was most directly involved in encouraging lower-level participants to engage in unlawful conduct. Rather, "[a] defendant acts as a 'manager or supervisor'. . . if he 'exercise[s] some degree of control over others involved in the commission of the offense,'" United States v. Payne, 63 F.3d 1200, 1212 (2d Cir. 1995) (quoting United States v. Liebman, 40 F.3d 544, 548 (2d Cir.1994), or "'play[s] a significant role in the decision to recruit or to supervise lower-level participants.'" Id. (quoting United States v. Greenfield, 44 F.3d 1141, 1147 (2d Cir.1995)).

Here, Levitis's supervisory role in the fraudulent scheme is amply demonstrated by the plea allocutions of his co-defendants. (See No. 13 Cr. 327, Kurlyand Plea Tr. (Dkt. No. 50) at 15-16 ("From about in July of 2009 to about July of 2012, while working at Mission, I participated in sales meetings, I followed up with salespeople in terms of instructions from Michael [Levitis] on, you know, acquiring customers to the company. I also helped Michael [Levitis] set up the mail campaign which solicited clients to participate. . . ."); No. 13 Cr. 327, Shulman Plea Tr. (Dkt. No. 77) at 11-12 ("As a sales representative I made false statements about several things, including Mission's fees, which were much higher than I had claimed. I

was instructed to make false statements by people I worked for including Michael Levit[i]s, who

is the owner of the Mission Settlement Agency. . . .”))

Accordingly, Levitis has not demonstrated that his lawyer was constitutionally

ineffective in stipulating to the three-level role in the offense enhancement, pursuant to U.S.S.G.

§ 3B1.1(b).

> **D.      Ineffective Assistance of Counsel Claim Premised on
> “Material Misrepresentations” or “Omissions” in the PSR**

Levitis argues that the PSR and the Government’s sentencing submission contain

a number of false factual allegations, and that his lawyer “knew that these allegations . . . were

materially wrong,” but “duped Mr. Levitis into agreeing not to challenge these material

misrepresentations and mischaracterizations during the presentencing phase,” and then “failed to

present the evidence that would have brought the misrepresentations to light at his sentencing

hearing.”  (No. 15 Civ. 8977 Pet. (Dkt. No. 1) at 21)  These purported misrepresentations include

that (1) Mission lied about or concealed its fees; and (2) while Mission promised its customers

substantial debt reduction, it did little or no work to accomplish this objective, and did not

achieve a reduction in debt for many of its customers.  (Id. at 21-22)

Any claim that Levitis was not involved in misrepresenting Mission’s fees and

prospective outcomes to customers is belied by his guilty plea.  During his allocution, Levitis

admitted that he had “agreed with other employees . . . to defraud Mission Settlement Agency’s

customers by making misrepresentations about Mission’s fees and results, among other things.”

(No. 13 Cr. 327, Plea Tr. (Dkt. No. 102) at 26).

Once confronted with these admissions, Levitis hastens to add – in his Reply –

that he “is not suggesting he is innocent but rather that there were material mitigating factors that

were not disclosed to the Court.”  (No. 15 Civ. 8977, Reply (Dkt. No. 13) at 5)  These “material

mitigating factors" include that (1) Levitis "espoused that the company operate within the bounds of the law"; (2) Mission in fact performed work for many of its customers; and (3) Mission's customer contract clearly states that Mission will receive, in addition to the $49 per month fee, "an administration fee equal to 18% of the total debt" placed with Mission.  (No. 15 Civ. 8977, Pet. (Dkt. No. 1) 21-26)  Levitis maintains that his lawyer "never disclosed [these 'mitigating factors'] to the court."  (Id. at 23)

In reality, defense counsel made all of these points on Levitis's behalf in sentencing submissions and at the sentencing hearing.

As to Levitis's efforts to encourage Mission to operate legally, Levitis cites a handful of emails, largely from 2009 or 2012, in which he tells Mission employees and others that Mission should adhere to legal practices.  (See, e.g., id. at 43-56; No. 15 Civ. 8977, Pet. (Dkt. No. 1-1) at 4-8; No. 15 Civ. 8977, Reply (Dkt. No. 13-6) at 12; No. 15 Civ. 8977, Reply (Dkt. No. 13-7) at 1-10)  That Levitis sometimes expressed a desire to act lawfully in 2009 and 2012 does not prove that he always did so, however, nor does it alter the evidence the Government offered of the illegal conduct described in the PSR.  Nor does it change the fact that Levitis admitted to his illegal conduct during his plea allocution and in his own letter to this Court.  (See No. 13 Cr. 327, Sept. 5, 2014 Levitis Ltr. (Dkt. No. 125-1) at 36 ("I am filled with remorse that my intentional and fraudulent conduct ruined so many people's lives.  I am alone to blame for their losses and pain.  I surrounded myself with people who followed me and took my counsel . . . . I groomed my employees to follow me. . . . I chose to run a business based on fraudulent lies and misrepresentations.")

In any event, the email messages Levitis cites essentially mirror arguments that his lawyer made to the Court.  In Levitis's sentencing submission, defense counsel argued that

"Mr. Levitis did not begin Mission Settlement Agency with the intent of committing fraud. Instead, he anticipated that Mission would be a legitimate and profitable business." (No. 13 Cr. 327, Sentencing Br. (Dkt. No. 125) at 21)  Counsel further argued that Levitis took "some measures to try to rectify the grosser abuses at Mission.  For example, in May 2012, he retained outside counsel to provide advice on marketing materials and company practices, and on the advice of outside counsel [] he implemented the practice of recording disclosures to customers about the fees and the risks of debt settlement programs. . . . [These efforts] . . .  demonstrate that Mr. Levitis was conflicted about his criminal conduct and on some level he really wanted to do the right thing by Mission's customers and operate an honest business." (Id. 23-24)  Counsel repeated these arguments at the sentencing hearing. (See No. 13 Cr. 327, Levitis Sentencing Tr. (Dkt. No. 164) at 30) ("Mr. Levitis did undertake measures that were an attempt to address some of the egregious conduct. . . .  He retained counsel and tried to get advice about how to improve. He instituted a phone call monitoring system and a practice of recording disclosures to try to [e]nsure that things improved.")

As to Levitis's contention that Mission performed legitimate work for many customers, neither the Government nor the Probation Office asserted that all of Mission's clients were defrauded.  For example, the PSR states that "2,200 customers" paid for Mission's services, but that "for over 1,200 of its customers, Mission took fees totaling nearly $2.2 million and never paid a single penny to the customers' creditors as payment for any negotiated debt." (PSR ¶ 17) The fact that many Mission customers received services from Mission does not excuse the fact more than a thousand were defrauded.

In any event, Levitis's counsel emphasized that the company had performed legitimate work for some clients.  In defense counsel's sentencing submission, he argued that

Mission had "successfully negotiated at least some of the accounts for a significant number of customers, saving them a substantial amount of money in debt owed," and that "some of Mission's customers saw their debts eliminated entirely."  (No. 13 Cr. 327, Sentencing Br. (Dkt. No. 125) at 22)  And at sentencing, defense counsel again insisted that "there were many clients that did have work done for them.  There were clients that were looked after and were saved money. . . . [D]ebt really was negotiated on behalf of many clients [and], for some, completely eliminated."  (No. 13 Cr. 327, Levitis Sentencing Tr. (Dkt. No. 164) at 32-33)[14]

Finally, as to Levitis's argument that Mission's customer contract revealed the company's 18 percent fee, this fact has never been in dispute.  Indeed, the Indictment itself states that Mission's contract "disclosed [its] fees."  (No. 13 Cr. 327, Indictment (Dkt. No. 1) ¶ 16)  The Government has always maintained that while Mission's customer contract states that Mission will receive a fee amounting to 18 percent of a customer's outstanding debt, sales representatives "often hurriedly directed customers to sign [the contract] . . . without first going over the terms with them."[15]  (Id.)  In any event, defense counsel provided the Court with a copy of Mission's contract along with Levitis's sentencing briefs (see No. 13 Cr. 327, Mission

---

[14]  Levitis suggests that the Government's investigation, which shut down Mission, increased the number of clients whose debts were not settled.  Similarly, he argues that many of the victim impact statements that this Court received and relied on were from clients whose debts "were not settled due to the shuttering of Mission."  (See No. 15 Civ. 8977, Pet. (Dkt. No. 1) at 25-26)  These points were also made by defense counsel.  (See No. 13 Cr. 327, Levitis Sentencing Tr. (Dkt. No. 164) at 33 ("Many Mission clients had debt being negotiated and settled when the company was raided and shut down.  Settlement efforts and settlements were stopped."); id. at 34 ("A lot of these angry victim letters were sent at the time that the company was raided and was shut down and were sent by clients who were caught in that process."))

[15]  Levitis admitted as much in the letter he submitted to the Court in advance of sentencing.  (See 13 Cr. 327 Sept. 5, 2014 Levitis Ltr. (Dkt. No. 125-1) at 35 ("I have hurt many Mission . . . clients who came to our office seeking relief from credit card debt but have instead been duped into signing a contract that they were rushed into without a step by step and clear explanation of its terms."))

Contract (Dkt. No. 139) at 90), and he emphasized at sentencing that the contract accurately reported Mission's fees.  (See No. 13 Cr. 327 Levitis Sentencing Tr. (Dkt. No. 164) at 30-31 ("Mission's own contracts . . . we suggest, are industry standard documents.  We included a Mission contract for the Court to take a look at . . . I would suggest to the Court that the typeface is far from fine print and that the fee provisions there . . . [are] clear on the face of the contract . . . [T]he contract laid it out."))

In sum, the three material mitigating factors cited by Levitis were all laid before the Court, and his lawyer made arguments premised on each one.  (No. 15 Civ. 8977, Pet. (Dkt. No. 1) 21-26)  Therefore, Levitis's ineffective assistance argument fails.[16]

## E.   <u>Levitis's Remaining Arguments</u>

Levitis's two remaining arguments require little discussion.  First, Levitis suggests that the difference between his sentence and the sentences imposed on his co-defendants "supports the notion that Mr. Ross's counsel to [him] was constitutionally deficient."[17]  (No. 15 Civ. 8977 Pet. (Dkt. No. 1) at 31)

Kurlyand and Shulman received substantially lower sentences than Levitis primarily because they were cooperating witnesses.  As to each, the Government moved the Court, pursuant to U.S.S.G. § 5K1.1, to impose a below-Guidelines sentence.  (See No. 13 Cr. 327 Kurlyand Sentencing Tr. (Dkt. No. 219) at 23 ("As to cooperation, the government has

---

[16]  In his reply brief, Levitis argues that his lawyer should have requested a <u>Fatico</u> hearing.  (See No. 15 Civ. 8977, Reply (Dkt. No. 13-3) at 2)  As with his conflict of interest argument, Levitis has waived this argument by raising it for the first time in his reply brief.  See <u>Farmer</u>, 2017 WL 3448014, at *3.

[17]  Whereas Levitis was sentenced to 108 months' imprisonment, Kurlyand was sentenced to a year and a day, and Shulman and Cruz received sentences of time-served.  (See No. 13 Cr. 327, Kurlyand Judgment (Dkt. No. 191); No. 13 Cr. 327, Shulman Judgment (Dkt. No. 183); No. 13 Cr. 327, Cruz Judgment (Dkt. No. 169))

represented that Mr. Kurlyand provided substantial assistance in the investigation and prosecution of his codefendants . . . and . . . has asked me to sentence him in light of the [factors] set forth in Section 5K1.1 of the guidelines."); No. 13 Cr. 327 Shulman Sentencing Tr. (Dkt. No. 194) at 27 ("As to cooperation, the government has represented that Mr. Shulman provided substantial assistance in the investigation . . . [a]nd . . . has asked me to sentence him in light of the factors set forth in Section 5K1.1 of the sentencing Guidelines."))

As for Cruz, this Court concluded that he was "significantly less culpable than other defendants in the case, and certainly compared to Mr. Levitis, the lead defendant and the architect of the scheme and its principal beneficiary . . . Mr. Cruz is [in] no way comparable in terms of his culpability to Mr. Levitis."  (No. 13 Cr. 327, Cruz Sentencing Tr. (Dkt. No. 192) at 22)  In reaching this conclusion, the Court noted that Cruz did not realize – when he first began work at Mission – that the company was engaged in fraudulent conduct.  Moreover, unlike other defendants, Cruz saw little in the way of financial benefit from his work there, and the number of people he had misled is "a very small number."  (Id. at 21-22)  In sum, Levitis's longer sentence had nothing to do with the quality of his lawyer, and everything to do with his greater culpability.

Finally, Levitis observes that, after his sentencing, "the United States Sentencing Commission[] recommended that the sentence enhancement for defendants involved in frauds with more than 250 victims be reduced from six levels to three levels."  (No. 15 Civ. 8977, Pet. (Dkt. No. 1) at 31)  Any change to the Guidelines after Levitis was sentenced cannot serve as the basis for an ineffective assistance claim.

## <u>CONCLUSION</u>

For the reasons stated above, Levitis's motion to vacate, set aside, or correct his sentence is denied.  Because Levitis has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue under 28 U.S.C. § 2253.  This Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore <u>in forma pauperis</u> status is denied for purposes of an appeal.  <u>Cf.</u> <u>Coppedge v. United States</u>, 369 U.S. 438, 444-45 (1962) (holding that an appellant demonstrates good faith when he seeks review of a non-frivolous issue).  The Clerk of Court is directed to close this case.  Chambers has mailed a copy of this Order to Michael Levitis, Inmate No. 78297-053, FCI Cumberland, P.O. Box 1000, Cumberland, MD 21501.

Dated:  New York, New York
        May 31, 2020

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge